**RELIABLE MARINE BOILER REPAIR, INC., Plaintiff,**

v.

**The sum of $35,000.00 in the possession of Frank B. Hall & Co., Inc., and Frank B. Hall & Co., Inc., Defendant;**

**The MASTAN COMPANY, Incorporated, Claimant.**

No. 67–Civ. 1066.

United States District Court, S. D. New York.

April 19, 1971.

37. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 848 (2d Cir.), cert. denied sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968).

Harry D. Graham, New York City, for plaintiff.

Zock, Petrie, Sheneman & Reid, New York City, for claimant; George D. Byrnes, New York City, of counsel.

## MEMORANDUM

CROAKE, District Judge.

This possessory action in admiralty presents an unusual and unfortunate situation. Plaintiff, a marine repairman, obtained and performed a certain repair contract, but has never been paid. This finding serves merely as the introduction to a complex legal dispute.

Besides plaintiff, the parties involved in this action are Frank B. Hall and Company ("Hall"), and the Mastan Company, Inc. ("Mastan"). The action was tried *in personam* as against Hall, although Hall had not defended, and *in rem* as against Mastan. However, plaintiff has now asserted, for the first time after trial, an *in personam* action against Mastan as well.

When the action was instituted, Hall, whose interest is essentially that of a stakeholder, appeared *pro se* and deposited the $35,000 res into the registry of the court. The real parties in interest, therefore, are plaintiff and the intervening claimant, Mastan. The facts giving rise to their respective claims are as follows.

On September 18, 1966, while en route from Sunny Point, North Carolina, to Zeebrugge, Belgium, with a cargo of ammunition and rockets destined for the N.A.T.O. Alliance forces, and while approximately 600 miles out to sea, the American flag steamship "Sapphire Sandy," owned by Sapphire Steamship Lines, Inc. ("the shipowner"), sustained boiler damage. (Sahler, Transcript, p. 24.) The severity of the damage, which was caused by the rupturing of a screen tube in the port boiler, precluded successful temporary repairs, and necessitated interruption of the voyage on September 20, and diversion of the vessel to New York as a port of refuge. Since the United States Coast Guard refused entry to the inner harbor while the ammunition remained on board the "Sapphire Sandy" anchored off Leonardo, New Jersey, and was put on general average pending resumption of the voyage. (Sahler, Tr. p. 34; Plaintiff's Exhibits 7 and 9.)

A joint survey was immediately held, on the evening of September 23, 1966, to establish the casualty and obtain expert opinion as to the necessary extent and the preferable method of repairs. In attendance were representatives of the plaintiff, the shipowner and operator (not interested in the outcome of this action), the American Bureau of Shipping, and the Coast Guard, and an agent of the London Salvage Association, the underwriters' surveyors. (Taylor, Tr. pp. 13, 21; Sahler, Tr. pp. 24–25; Plaintiff's Exhibits 1 and 2.)

The parties to the survey agreed that on-board repairs were preferable to work at a pier, which would have involved the delay and expense of unloading the ship with lighters. It was also agreed that plaintiff perform the specified repair work; plaintiff eventually

charged $39,260.08 for its services. Plaintiff was chary about relying for payment upon the shipowner's credit or upon its customary maritime lien on the vessel, apparently already heavily encumbered, so it was further agreed that plaintiff be paid $35,000 "on account," as a direct payment from the underwriters of the applicable hull and machinery insurance policies.

The shipowner therefore agreed to provide the necessary documentation to prove the loss, and Hall, who was both insurance broker for the owner's fleet, including the "Sapphire Sandy," and also average adjuster for the vessel, agreed to collect the *pro rata* contributions of the various American and British underwriters, and then remit the money to plaintiff, rather than to the owner or Mastan, the mortgagee of the vessel. (Taylor, Tr. pp. 14–17, 21; Kanapaux, Tr. pp. 39–44; Plaintiff's Exhibits 4–7.)

In other words, plaintiff was in effect assigned the insurance proceeds, as distinguished from the policies themselves, although no formal written assignment was ever prepared. This troublesome lack was caused either by a mistake in judgment or through an oversight during the documentation of the casualty or elsewhere in the haste of the moment; the consequences were such that it is unlikely that such an omission will ever be allowed to occur in the future.

Plaintiff commenced work in reliance upon the "pre-repair agreement," and the expectation of its approval by Mastan. It began on September 24, 1966, the morning after the survey, and completed its job on October 10, 1966. Its bill dated December 9, 1966, was subsequently approved by the necessary entities. When the papers were complete, Hall began to receive the contributions from the underwriters; $31,500 of the $35,000 payment was received by March 2, 1967. Had not supervening events interfered, plaintiff would undoubtedly have been paid soon thereafter without further incident. (Taylor, Tr. p. 21; Sahler, Tr. p. 29; Plaintiff's Exhibit 1.)

Unfortunately, the shipowner's finances deteriorated in the period after the completion of plaintiff's work, and it failed to make the February 28, 1967 payment on its note to Mastan. Mastan, which was owed in excess of $800,000 at the time, immediately moved to vindicate all its rights in order to prevent a huge loss.

One remedy to which it claims to be entitled, the only relevant one in this context, was direct payment to itself of insurance proceeds then owing under the "loss payee" clause of the hull and machinery insurance. The clause reads as follows:

"Loss, if any, payable to The Mastan Company, Incorporated, 640 Fifth Avenue, New York City, mortgagee, for distribution by and to itself and Sapphire Steamship Lines, Inc., as interest may appear, or order, except that all claims not exceeding $25,000 each accident or occurrence may be paid directly to Sapphire Steamship Lines, Inc. or order, until the mortgagee may otherwise direct in writing." (Cl's Exhibits A–C.)

Accordingly, Mastan by letter dated March 2, 1967 to Hall directed that all insurance proceeds be paid to it. (Gold, Tr. pp. 85–88; Cl's Exhibit Z.) When plaintiff inquired as to the proximity of payment and was told of this letter, it made formal demand on March 10, 1967 for the earmarked funds, and then instituted this action. (Plaintiff's Exhibit 10.) On the return day, as has been noted above, Hall appeared in court *pro se*, declared itself a "mere stakeholder," and sought and obtained leave from Judge Frederick vP. Bryan to deposit the res into the registry of the court. The res was paid in on April 10, 1967, pursuant to the order signed March 31, 1967 and filed on April 3, 1967. Hall has not answered the complaint or otherwise defended this action thereafter.

Maston also appeared on the return date, and obtained leave to interpose its

claim to the res. It then moved to vacate the arrest; the motion was denied by Judge Marvin E. Frankel on July 12, 1967 (270 F.Supp. 1017). Cross-motions for summary judgment and plaintiff's motion for reargument thereof, were subsequently denied by Judge John F. X. McGohey, on May 17 and June 6 of 1968.

At trial and in its post-trial papers, plaintiff has asserted five separate claims: (1) for the $35,000 res, (2) for the $4,260.08 deficiency between the payment on account (the res) and the full amount of plaintiff's bill, (3) for interest on the full $39,260.08, (4) for counsel fees, and (5) for the costs of this action.

## I—THE CLAIM FOR $35,000.00

The basic issue in this case is Mastan's right to "recapture" insurance proceeds already pledged to plaintiff. In this regard, it will be noted that, despite the lack of a document titled "assignment," which has been prepared in similar situations (Gold, Tr. pp. 105–106; Cl's Ex. AA, AB), the owner and Mastan had initially proceeded as if the proceeds had in fact been assigned. Their conduct is explained by the fact that the insurance coverage had been initiated with the understanding that repairs would normally be paid for by means of assignments. (Gold, Tr. pp. 106–107.) This becomes evident upon examination of the terms of the First Preferred Fleet Ship Mortgage between the shipowner and Mastan, which stated:

"All policies of insurance or other evidence thereof shall provide that losses thereunder shall be payable to Mortgagee; provided, however, that so long as no default exists under the Mortgage, the Note, or Agreements between Owner and Mortgagee, and if underwriters have not been otherwise instructed in writing by Mortgagee,

\*    \*    \*    \*    \*    \*

"(ii) Any loss involving damage to \* \* \* Vessel may be paid by underwriters direct for the repair \* \* \* provided further that if such damage exceeds $25,000.00, underwriters shall not make payment without the prior written consent of Mortgagee.

"The owner shall, at its own expense make all Proofs of Loss and take all steps and do any and all things to effect collections for all losses under all insurance on the Vessels." (Cl's Exhibit Q, Paragraph 15.)

In connection with its preparation of proofs of loss, the shipowner therefore sought and obtained payment authorizations from Mastan. These were sent by Mastan to Hall under cover letters dated October 6, 1966, for the American underwriters, and October 14, 1966 for their British counterparts. (Sahler, Tr. pp. 26–27; Miller, Tr. p. 46; Gold, Tr. pp. 84–85; Plaintiff's Exhibits 5, 6.)

While the factual and procedural complexity of this action somewhat obscures the substantive issues presented, they actually resolve into straightforward questions of equity. Certain things are not contested: it is agreed that the real parties in interest herein are plaintiff and the intervening claimant; in this regard the action can be considered as akin to statutory interpleader. Furthermore, it is uncontroverted that the relation of the claimant-mortgagee, Mastan, and the shipowner was such that the insurance proceeds attributable to the casualty repaired by plaintiff—the res herein—were payable to Mastan in the first instance. *See* Factoring & Discount #2 v. Central Mutual Ins. Co., 125 F.Supp. 627 (S.D.N.Y.1954, Ryan, J.), affirmed 216 F.2d 751 (2d Cir. 1954).

It is also clear that the actions taken by the shipowner and the other parties to the pre-repair agreement, in preparing and submitting the proofs of loss and in ordering and approving payment by the underwriters to Hall for plaintiff's account, evidence their belief that an assignment of all interests in the insurance proceeds had been or was being made to plaintiff. The questions which are actually in issue are therefore

these:[1] (1) Did Mastan's payment authorizations and cover letters amount to an assignment of the proceeds to plaintiff's account; (2) if an assignment was effected, was it revocable on March 2, 1967, when payment was directed to be made to Mastan; and (3) is Mastan alternatively personally liable to plaintiff.

■ To answer the questions in order: (1) There was in fact an assignment by Mastan of its interest in the res herein. While Mastan was not represented at the survey of the casualty, the parties to the survey reasonably expected it to consent to their agreement. The reasonableness of their expectations was borne out by Mastan's quick authorizations of the method of payment. The authorizations were addressed to the underwriters, and the cover letters were sent to Hall, but when interpreted in light of the context they were evidently intended to run to plaintiff's benefit, if not directly, then through the shipowner. If the latter be the case the effect is the same, since Mastan had been approached on this matter by the shipowner, and must have been aware of its assignment of its interest to plaintiff. (Miller, Tr. p. 46.)

Mastan argues that it could not have intended an assignment to run to plaintiff's benefit, since it was ignorant of plaintiff's existence and, for that matter, of the state of repairs at the time the authorizations were sent to Hall. However, whatever Mastan's knowledge may have been as to plaintiff's identity, the fact that it sent the authorizations evidences its awareness that some repairer was working on, or about to work on, the vessel. (McGreevy, Tr. pp. 115–124.) This assignment and ratification of the method of payment created a valid and enforceable contract of assignment between Mastan and plaintiff: plaintiff agreed to accept an assignment in order to be more certain of prompt payment, and Mastan granted it in consideration of the enhancement of its security to be gained thereby. See Williston, Contracts, Third Edition, §§ 1536, 1542 et seq.

(2) Whatever risks plaintiff might have assumed by beginning its repair work before receipt of the payment authorizations, it completed its repairs, submitted its bill, and passively awaited payment in reliance upon the contract of assignment.

This reliance by plaintiff and the other parties to the pre-repair agreement upon Mastan's assent to its terms was reasonable in light of their knowledge that the prompt completion of repairs stood to benefit Mastan in several ways. First, it restored *pro tanto* the value of the vessel, which stood as security for a large loan. The necessity for such security was proven by the fact of the shipowner's subsequent default on the loan note and the eventual foreclosure of the mortgage on the vessel. (Gold, Tr. p. 102; Barth, Tr. pp. 126–127.)

A second benefit to Mastan from plaintiff's services was that they made possible the completion of the voyage and therefore of the shipowner's contract to transport the ship's cargo. Since the freight receipts from this voyage were pledged as additional security for the same loan, plaintiff's efforts increased Mastan's security in this regard also.

A third benefit was that plaintiff's repairs enabled the ship to be taken off general average, and thereby to end the necessity for contributions from all affected interests, including the shipowner and Mastan. It was to reduce the average adjustment that plaintiff moved as quickly as it did; Mastan is now attempting to obtain a windfall through capitalization upon action taken for its benefit.

■ The court therefore finds that Mastan is not entitled to the equitable remedy of recission of the contract of assignment. See Williston, Contracts,

---

1. The court expresses no opinion as to the merit of claims not properly asserted herein; see *infra*.

Third Edition, § 410. Furthermore, if it be assumed that some unidentified infirmity exists such as to prohibit contractual enforcement in the face of an attempted recission, on this record it would still be entirely proper for Mastan to be held estopped from asserting the revocation.

In this action all the elements for equitable estoppel are present; New York Rubber Co. v. Rothery, 107 N.Y. 310, 316, 14 N.E. 269, 271 (1887.) Plaintiff acted in order to benefit Mastan, and did benefit it. Plaintiff's reliance upon Mastan's assignment was reasonable and although now attacked, was originally encouraged by the giving of the payment authorizations and the cover letters. Any carelessness involved was attributable, not to plaintiff, but to Mastan for failing to keep abreast of its mortgagor's business affairs and true financial condition. (See McGreevy, Tr. pp. 123–124.)

If it be assumed, *arguendo*, that Mastan is not estopped from asserting that the March 2, 1967 letter revoked its assignment, the question then arises whether the letter was competent to do so. The court finds that it was not.

■ On its face, Mastan's letter is probably sufficient notice of revocation, if viewed *in vacuo*. But in the context in which it was drafted and sent, it was in excess of Mastan's authority under the loss payee clause. When that clause is interpreted in connection with the ship mortgage which mandated its creation and in light of the entire relationship between Mastan and the shipowner, it becomes apparent that there are some limits to the broad power of Mastan to obtain payment of insurance proceeds.

The loss payee clause was designed to protect the security interest of the mortgagee. The phrase, "or order," was accordingly inserted so as to permit the mortgagee more flexibility in the protection of its interest, flexibility which was utilized in the case at bar by assignment of its rights and interest in the proceeds to plaintiff. Similarly, the words, "until the mortgagee may otherwise direct in writing," much relied upon by Mastan, were designed to allow even more flexibility in attaining the same end of protection of the mortgagee's security interest.[2]

The loss payee clause therefore grants Mastan various options, but only "as [its] interest may appear." Where, as here, an irrevocable assignment has been made, Mastan no longer retains an interest. *See* 5A Appleman, Insurance Law and Practice, § 3407. The loss payee clause must therefore be considered unavailable to Mastan, with regard to these insurance proceeds. The court accordingly concludes that plaintiff, not Mastan, is entitled to possession of the $35,000.00 res in suit.

■ (3) The foregoing is sufficient to determine the relative rights of the litigants to the res. However, in the interest of completeness, the court notes that although its jurisdiction was originally invoked as against Mastan in rem only, Mastan's "restrictive appearance," under Rules D and E of the Supplemental Rules for Admiralty, was ineffective in preventing this court from obtaining personal jurisdiction over it by reason of its appearance herein; *see* Judge Frankel's opinion in this case, *supra;* Moore, Federal Practice § 12.12. It is therefore within this court's power, and entirely appropriate in these circumstances, to hold Mastan personally liable to plaintiff in the amount of $35,000.00, alternatively in performance of its contractual duties, or under a theory of quasi-contract.

## II—THE SUPPLEMENTAL CLAIM FOR $4,260.08

Personal jurisdiction exists over Mastan such as to permit entry of a judgment against it for the full amount of plaintiff's repair bill, were Mastan

---

2. This assumes that the above-quoted words are applicable to the situation at bar, rather than being restricted to situations involving less than $25,000.00.

found liable. However, the court is of the opinion that Mastan is not liable.

The case was tried essentially as an *in rem* action; the first time that an *in personam* claim for an amount greater than the res was asserted was in plaintiff's post-trial papers. This claim was apparently then grounded in asserted unjust enrichment, interference with contractual relations, and fraud.

■ As to the merits of these bases for liability no opinion is expressed, since they were untimely raised. Despite fleeting references to this additional claim (*See, e. g.*, Sahler, Tr. p. 33), the issue was never adequately presented. Moreover, Mastan properly relied throughout trial upon the pre-trial order of September 19, 1969, which made no amendments to the pleadings and stated the sum in issue to be $35,000.00, and upon Judge Frankel's opinion, *supra*, which concluded that the court's jurisdiction rested upon in rem principles. At this late date Mastan is precluded from offering evidence on these matters. This court will not foreclose Mastan's right to trial of these issues. Therefore, plaintiff's proposed findings numbered 12 and 17 are deemed to constitute an application to amend the pleadings pursuant to Rule 15, F.R.Civ.P., and, as such, is denied.

## III—THE CLAIM FOR INTEREST

■ Plaintiff's application for an award of interest either on the res or upon its personal cause of action is denied. The res has been in the possession of the court for substantially the entire period since the cause of action accrued. Mastan has not received any interest on this sum, or other benefit from its use; indeed, on plaintiff's application the money would have been deposited in an interest-bearing account; F.R.Civ.P. 67; Prudential Ins. Co. of America v. King, 308 F.Supp. 1143 (W. D.Miss.1969). On these facts it would be inequitable to tax Mastan for interest.

## IV—THE CLAIM FOR COUNSEL FEES

■ Plaintiff's request for an award of counsel fees is likewise denied. The contents of this opinion, as well as those of Judges Frankel and McGohey, *supra*, should evidence the fact that this is a complex action the resolution of which was not susceptible of accurate prediction before trial. The record shows that Mastan has asserted its claim to the res in good faith, without any motive to oppress the plaintiff. "American courts have traditionally refused to include counsel fees in a losing party's bill of costs, except in the most extraordinary of instances;" Fleischer v. Paramount Pictures Corp., 329 F.2d 424, 425 (2d Cir. 1964).

## V—TAXATION OF COSTS

■ If taxation of attorneys' fees is extraordinary, that of taxable costs of the action is not. The court possesses personal jurisdiction over Mastan to do so; *see supra*. Furthermore, most costs herein incurred by plaintiff were necessitated by Mastan's actions in this suit. Taxation of costs is therefore appropriate.

## CONCLUSION

The court finds that plaintiff, Reliable Marine Boiler Repair, Inc., is justly entitled to judgment awarding it possession of the $35,000.00 res now lying in the registry of the court. The intervening claim of Claimant, The Mastan Company, Inc., is dismissed on the merits. Plaintiff is also entitled to tax its statutory costs and disbursements necessarily incurred herein against Mastan.

The foregoing shall constitute the court's findings of fact and conclusions of law, pursuant to F.R.Civ.P. 52.

Submit order on notice.

So ordered.